The State, ex rel. Horner, *v.* Anderson et al.

(No. 74-862—Decided March 5, 1975.)

Mr. *Jerry J. Hultin* and Mr. *George R. Penfield,* for relator.

Mr. *William J. Brown,* attorney general, Mr. *James A. Laurenson,* Mr. *Blaine Fielding* and Mr. *Ronald B. Brown,* for respondents.

STERN, J. The essential question in this case is the meaning of two sections of the Ohio Constitution, Section 8 of Article II and Section 21 of Article III. Relator claims that, read together, those sections provide that an appointment to state office submitted to the Senate during its first regular session is consented to as a matter of law if consent is not refused prior to the first day of the second regular session of the Senate. For the reasons given herein, we find that this claim is not sustained by the language or purpose of those sections of the Ohio Constitution, and we therefore deny the writ of mandamus.

Section 21 of Article III was adopted on November 7, 1961. It provides, in part:

"If an appointment is submitted during a session of the General Assembly, it shall be acted upon by the Senate during such session of the General Assembly, except that if such session of the General Assembly adjourns sine die within ten days after such submission, without acting upon such appointment, it may be acted upon at the next session of the General Assembly.

"If an appointment is made after the Senate has adjourned sine die, it shall be submitted to the Senate during the next session of the General Assembly."

At the time that section was adopted, the Ohio Constitution provided that the General Assembly was to meet biennially on the first Monday of January. (Former Sec-

tion 25 of Article II, repealed on May 8, 1973.) A "session" of the General Assembly lasted from the first meeting of the General Assembly until adjournment sine die, which could be at any time within such two-year period.

Although the original expectation of the framers of the Constitution of 1851 was that a biennial meeting of the General Assembly would be sufficient, in view of the modest requirements of the time for new legislation, the practice eventually developed of continuing sessions into the second year by adjournment to a named date.[1]

This practice existed in 1961 when Section 21 of Article III was adopted, and "session," as originally used in that section, meant either the period of a special session or the period from the first meeting of a new General Assembly on the first Monday in January, until adjournment sine die of that General Assembly at some time within such two-year period. Thus, a "session" corresponded to the electoral term of the Ohio General Assembly (with the exception of special sessions), and Section 21 of Article III, when adopted, provided that an appointment requiring consent, unless acted upon within that period, was deemed consented to by the Senate. The purpose of this amendment was, no doubt, to prevent indefinite periods of uncertainty in the status of appointments and to ensure that decisions on appointments would be made by a single body of senators.

The anomalous situation of having a theoretically biennial General Assembly which in practice met every year was resolved by the enactment of Section 8 of Article II on May 8, 1973, which repealed Section 25 of Article II. Section 8 provides, in part:

"Each General Assembly shall convene in first regu-

---

[1]This practice was followed by the Senate in the instant case. The Senate did not adjourn sine die at any time between its first meeting in 1973 and June 6, 1974, when, by a roll call vote, consent was refused to the appointment of relator. On September 11, 1973, the Senate adjourned to the date certain of January 2, 1974. The Senate met pursuant to adjournment on that date, and on January 3, 1974, adjourned to the date certain of January 8, 1974, the day following the first Monday in January.

lar session on the first Monday of January in the odd-numbered year, or on the succeeding day if the first Monday of January is a legal holiday, and in second regular session on the same date of the following year.''

That section provides for two regular sessions during the term of each General Assembly.

The issue presented in this case is whether Section 8 of Article II applies to create two separate ''sessions'' in the sense that term is used in Section 21 of Article III. More particularly, the issue is whether R. C. 3.03, which permits an appointment to be carried over from the first to the second regular session of the Senate, conforms to the constitutional requirements of Section 21 of Article III.

This issue turns on the intent of Section 8 of Article II. Was its purpose to create two distinct ''regular sessions,'' as relator contends, or was its purpose to establish a single continuous session divided into two mandated chronological ''regular sessions''?

In *Castleberry* v. *Evatt* (1946), 147 Ohio St. 30, 67 N. E. 2d 861, this court stated, in the first paragraph of the syllabus: ''In the interpretation of an amendment to the Constitution the object of the people in adopting it should be given effect; the polestar in the construction of constitutional, as well as legislative, provisions is the intention of the makers and adopters thereof.'' In the instant case, the language of the two constitutional sections is not, on its face, free from doubt as to the proper meaning, and the history of these sections is instructive as to their actual intent.

Evidence of the intent of Section 8 of Article II is found in the text of the Ohio Constitutional Revision Commission's recommendation of the section. See Recommendation for Amendments to the Ohio Constitution by The Ohio Constitutional Revision Commission, issued December 31, 1971, pages 29 *et seq.* The commission was the original drafter of the section, and its draft was approved without change by the General Assembly and by the voters. The commission, in its recommendation to the General Assembly, stated the rationale of the section, as follows:

"The commission favors constitutional recognition of annual sessions because it would conform the Constitution to current practice. Annual sessions are recommended by most authorities in state government and the Legislature itself seems to recognize the necessity of meeting every year. The commission regards the proposal as an important element in strengthening the power of the legislative branch and insuring its ability to deal with problems as they arise.

"*Constitutional recognition of annual sessions does not require that unfinished business carry over from the first to the second session of a single two-year Legislature. The commission confronted this question in its deliberations and concluded that the General Assembly would have the continued authority to determine its own policy on this matter.* Whether the provision would require a *sine die* adjournment at the end of the first year and a new beginning in the second year was another point of inquiry. The section is regarded as sufficiently broad for the General Assembly to make the determination. *Specifically rejected were suggestions to limit the second year session to fiscal or other matters. The commission did not favor constitutional limits on time or subject matter.*"[2] (Emphasis added.)

---

[2]In the same recommendation, the commission considered the dates upon which it would be most beneficial for members of the General Assembly and the Governor to assume their respective offices:

"Under present Section 25 regular sessions commence on the first Monday of January, and the Constitution makes no exception for the years in which New Year's Day is celebrated on the same day. The committee considered and rejected an alternative calling for session commencement on the second Monday in January to avoid the holiday meeting because the Constitution otherwise provides that the Governor and other state officers take office on the second Monday in January. In deference to the dignity of the separate branches the committee felt that the gubernatorial inauguration and convening of the Legislature should not fall on the same day. If the Legislature meets a week earlier, it is organized and ready to transact business on the day that the Governor takes office. From a practical standpoint joint convention and inauguration would cause problems of congestion and detract from public exposure and recognition of the Legislature."

The commission stated further that the effect of the proposal is "that *one* General Assembly convenes in *two* regular sessions. * * * The proposal does not restrict the subject matter of business to be transacted in either session."

The intent of the commission was clearly to bring constitutional provisions into conformance with practice and to provide a definite and regular starting date for the second regular session of the General Assembly. This intent is shown by the commission's adoption of the language of then existing R. C. 101.01, which specifically provided for a second session of each General Assembly, which was to be "a continuum of the regular session." The commission specifically disclaimed any intention to modify the current practice and procedures of the General Assembly, and considered that "the General Assembly would have continued authority to determine its own policy on this matter."

The General Assembly, in approving the recommendation of the commission, also apparently considered that Section 8 of Article II did not mandate distinct legislative sessions. The General Assembly, in amending R. C. 101.01 following the adoption of Section 8 of Article II, only added language for conformance with the new constitutional language, in providing that "* * * the second regular session of each General Assembly shall be a continuum of the first regular session." The General Assembly expressly provided that appointments subject to consent by the Senate could be carried over to the second regular session, by amending R. C. 3.03 to provide that, effective September 17, 1973:

" * * * A person appointed by the Governor when the Senate is not in session or on or after the convening of the first regular session and more than ten days before the adjournment sine die of the second regular session to fill an office for which a fixed term expires or a vacancy otherwise occurs is considered qualified to fill such office until the Senate before the adjournment sine die of its second regular session acts or fails to act upon such appointment pursuant to Section 21 of Article III, Ohio Constitution."

The legislative policy embodied in this language is to permit the carryover of appointments to the second regular session of a General Assembly.

This court has previously stated the fundamental proposition that "an enactment of the General Assembly is presumed to be constitutional, and before a court may declare it unconstitutional it must appear beyond a reasonable doubt that the legislation and the constitutional provision are clearly incompatible." *State, ex rel. Dickman,* v. *Defenbacher* (1955), 164 Ohio St. 142, 128 N. E. 2d 59, paragraph one of the syllabus.

In the instant case, the purpose of the framers of Section 8 of Article II is clear—to provide a definite starting date for the second session of the General Assembly, while allowing the General Assembly to establish its own procedural rules for its term of office. We do not find any conflict with Section 21 of Article III, in which the period of a session encompasses both the first and second regular sessions of the General Assembly, as these were later established by Section 8 of Article II.

Because the relevant sections of R. C. 3.03 and 101.01 are not unconstitutional, the action of the Senate in refusing its consent to the appointment of relator was valid, and relator has no legal right to a position on the Reclamation Board of Review.

The writ of mandamus is therefore denied.

*Writ denied.*

O'NEILL, C. J., HERBERT. CELEBREZZE, W. BROWN and P. BROWN, JJ., concur.

CORRIGAN, J., dissents.