THE STATE, EX REL. HODGES ET AL., *v.* TAFT, SECY. OF STATE, ET AL.

[Cite as *State, ex rel. Hodges, v. Taft* (1992), 64 Ohio St.3d 1.]

(No. 92–16—Submitted April 8, 1992—Decided May 13, 1992.)

2

*Vorys, Sater, Seymour & Pease, Sandra J. Anderson* and *Jacob E. Davis II,* for relators.

*Lee I. Fisher,* Attorney General, *Cherry L. Poteet* and *Andrew I. Sutter,* for respondent Bob Taft.

*Lee I. Fisher,* Attorney General, and *Theresa Rittinger Schaefer,* for respondents General Assembly, Martha L. Butler and Dean Johnson.

*Donald J. McTigue,* urging denial of the writ for *amicus curiae,* Ohio Citizen Action.

---

GRADY, J.  The complaint presents three issues for consideration:

(1) Whether respondent Taft was required to disqualify those petitions and part-petitions without an executed circulator's compensation statement and/or required to advise the boards of elections to do so;

(2) Whether respondent Taft was required to withhold transmission of the proposed law to the General Assembly until the beginning of the next biennium in January 1993; and

(3) Whether the prerequisites for mandamus have been satisfied.

## I

### Mandamus

A writ of mandamus is an order, in this case to a public officer, to perform an act which the law specifically enjoins as a duty resulting from his office. R.C. 2731.01.  In order to grant a writ of mandamus, a court must find that the relator has a clear legal right to the relief prayed for, that the respondent is under a clear legal duty to perform the requested act, and that the relator has no plain and adequate remedy at law.  *State, ex rel. Harris, v. Rhodes* (1978), 54 Ohio St.2d 41, 8 O.O.3d 36, 374 N.E.2d 641.

A court in a mandamus proceeding cannot create the legal duty the relator would enforce through it;  creation of the duty is the distinct function of the legislative branch of government.  *State, ex rel. Stanley, v. Cook* (1946), 146 Ohio St. 348, 32 O.O. 419, 66 N.E.2d 207; *Davis v. State, ex rel. Pecsok* (1936), 130 Ohio St. 411, 5 O.O. 20, 200 N.E. 181, paragraph one of the syllabus.

Mandamus cannot be used to compel the performance of a permissive act. *State, ex rel. Niles, v. Bernard* (1978), 53 Ohio St.2d 31, 7 O.O.3d 119, 372 N.E.2d 339. A writ cannot issue to control an officer's exercise of discretion, but it can be issued to compel him to exercise it when he has a clear legal duty to do so. See *State, ex rel. Martin, v. Corrigan* (1986), 25 Ohio St.3d 29, 25 OBR 24, 494 N.E.2d 1128.

Where a petition filed in this court or in the court of appeals is in the form of a proceeding in mandamus but the substance of the allegations makes it manifest that the real object of the relator is an injunction, such a petition does not state a cause of action for mandamus and must be dismissed for want of jurisdiction. *State, ex rel. Pressley, v. Indus. Comm.* (1967), 11 Ohio St.2d 141, 40 O.O.2d 141, 228 N.E.2d 631, paragraph four of the syllabus. In that event, a remedy in injunction must be pursued. *State, ex rel. Corron, v. Wisner* (1971), 25 Ohio St.2d 160, 54 O.O.2d 281, 267 N.E.2d 308. The availability of an action for declaratory judgment does not bar issuance of a writ of mandamus when the relator demonstrates a clear legal right to it, although the availability of declaratory judgment may be considered by the court as an element in deciding whether a writ should issue. *State, ex rel. Fenske, v. McGovern* (1984), 11 Ohio St.3d 129, 11 OBR 426, 464 N.E.2d 525, paragraph two of the syllabus.

A petition for writ of mandamus must set forth facts showing that the relator is a party beneficially interested in the requested act before a proper claim is established. R.C. 2731.02; *State, ex rel. Snyder, v. State Controlling Bd.* (1983), 11 Ohio App.3d 270, 11 OBR 449, 464 N.E.2d 617. The status of a taxpayer is generally sufficient to show such an interest. *State, ex rel. Pressley, v. Indus. Comm., supra,* paragraph nine of the syllabus.

Relators Hodges, Swank, and Mahaney allege that they are taxpayers and electors. Respondent Taft admits the allegation. The remaining respondents deny for want of knowledge, but have not otherwise refuted. Relators have, therefore, demonstrated a beneficial interest in the act or acts they request. Whether they are entitled to the writ they request requires a discussion of the specific causes and grounds involved.

II

Verification of Petitions

Section 1, Article II of the Ohio Constitution places the legislative power of the state in the General Assembly, but reserves to the people the right to propose, adopt or reject legislation and constitutional amendments by initiative and referendum. The grant to the General Assembly is a delegated power. Initiative and referendum are reserved powers. "[They] compre-

hen[d] all of the sovereign power of legislation not thus delegated. * * * [The powers are] not to be restricted by any limitations, except such as are imbedded [*sic*] in the federal constitution." *Pfeifer v. Graves* (1913), 88 Ohio St. 473, 486, 104 N.E. 529, 533. The powers of initiative and referendum should be liberally construed to effectuate the rights reserved. *Hilltop Realty, Inc. v. South Euclid* (1960), 110 Ohio App. 535, 13 O.O.2d 348, 164 N.E.2d 180. " * * * The general assembly cannot enlarge the power of the people nor can it diminish it." *Shryock v. Zanesville* (1915), 92 Ohio St. 375, 385, 110 N.E. 937, 940.

Section 1b, Article II provides, in pertinent part:

"When at any time, not less than ten days prior to the commencement of any session of the general assembly, there shall have been filed with the secretary of state a petition signed by three per centum of the electors *and verified as herein provided,* proposing a law, the full text of which shall have been set forth in such petition, the secretary of state shall transmit the same to the general assembly as soon as it convenes." (Emphasis added.)

A "verification" is a confirmation of correctness, truth, or authenticity by oath or affidavit. Black's Law Dictionary (6 Ed.1990) 1561. The matter to be verified in this case is the witnessing of the signatures of electors who have signed the petition. Section 1g provides for that verification by the circulator of the petition:

" * * * The names of all signers to such petitions shall be written in ink, each signer for himself. To each part of such petition shall be attached the statement of the circulator, *as may be required by law, that he witnessed the affixing of every signature.*" (Emphasis added.)

Section 1g delegates to the General Assembly the power to make requirements for the circulator's verification. However, that authority is narrowed by the final provisions of the section, which state:

" * * * The foregoing provisions of this section shall be self-executing, except as herein otherwise provided. Laws may be passed to facilitate their operation, but in no way limiting or restricting either such provisions or the powers herein reserved."

The General Assembly has enacted two companion provisions concerning the circulator's verification. R.C. 3519.05 sets out the form to be used for initiative petitions, which includes the following statement for execution by the circulator:

"In consideration of his services in soliciting signatures to this petition the solicitor has received or expects to receive ............... from ............... (Whose address is) ...............

"Before any elector signs the part-petition, the solicitor shall completely fill in the above blanks if the solicitor has received or will receive any consideration and if the solicitor has not received and will not receive any consideration he shall insert 'nothing.'"

The General Assembly has also provided, in R.C. 3519.06, for "verification" of the petition.

"No initiative or referendum part-petition is properly verified if it appears on the face thereof, or is made to appear by satisfactory evidence:

"(A) *That the statement required by section 3519.05 of the Revised Code is not properly filled out;*

"(B) That the statement is not properly signed;

"(C) That the statement is altered by erasure, interlineation, or otherwise;

"(D) That the statement is false in any respect;

"(E) That any one person has affixed more than one signature thereto." (Emphasis added.)

Read together, these two sections require completion of the prescribed statement by a circulator of his or her compensation as part of the verification required by Sections 1g and 1b, Article II to qualify the signatures on the petition. Apparently, neither the Secretary of State nor the various boards of elections that reviewed the petitions have disqualified signatures on this basis, even though many of the petitions may have failed to comply. Indeed, Directive No. 91–40 issued to the boards by respondent Taft advised that a petition should *not* be rejected for that reason.

Relators argue that the actions of respondent Taft are contrary to the clear legal duties imposed on him by R.C. 3501.04, designating him the chief elections officer of the state, and his duty under R.C. 3501.05 to advise the boards of elections and compel their observance of the requirements of the election laws. They point out that the secretary is specifically required by R.C. 3501.05(K) to "[r]eceive all initiative and referendum petitions on state questions and issues and determine and certify to the sufficiency of such petitions." Relators also rely on the prior holdings of this court that the Secretary of State has the authority to reject petitions for defects in the circulator's verification statements. See *State, ex rel. Herbert, v. Mitchell* (1939), 136 Ohio St. 1, 15 O.O. 330, 22 N.E.2d 907; *State, ex rel. Tulley, v. Brown* (1972), 31 Ohio St.2d 188, 60 O.O.2d 371, 287 N.E.2d 630.

A duty enforceable through a writ of mandamus must be created by the legislature. *Davis v. State, ex rel. Pecsok, supra.* Further, it must be a duty that the respondent is specifically enjoined to perform. While authority for the secretary's rejection of petitions for improper or incomplete verification

may be found in R.C. 3501.04 and 3501.05, those statutes have not imposed a *specific* duty on the Secretary of State to do so. His authority is permissive. The authority of the secretary to reject petitions for failures in circulator's verification that we found in *State, ex rel. Herbert, v. Mitchell, supra,* and *State, ex rel. Tulley, v. Brown, supra,* was also "permissive," *i.e.,* one he was allowed to exercise but which was not required of him. Mandamus will not lie to require the performance of a permissive act because the actor has no duty to perform it. *State, ex rel. Niles, v. Bernard, supra.*

A specific duty to review initiative petitions, to determine that the signatures of electors are properly verified by their circulators, and to reject them for failure to contain a proper verification has been imposed by the General Assembly on the boards of elections in R.C. 3519.15, which provides:

"Whenever any initiative or referendum petition has been filed with the secretary of state, he shall forthwith separate the part-petitions by counties and transmit such part-petitions to the boards of elections in the respective counties. *The several boards shall proceed at once to ascertain whether each part-petition is properly verified,* and whether the names on each part-petition are on the registration lists of such county, or whether the persons whose names appear on each part-petition are eligible to vote in such county, and to determine any repetition or duplication of signature, the number of illegal signatures, and the omission of any necessary details required by law. The boards shall make note opposite such signatures and submit a report to the secretary of state indicating the sufficiency or insufficiency of such signatures and *indicating whether or not each part-petition is properly verified, eliminating, for the purpose of such report, all signatures on any part-petition that are not properly verified.*" (Emphasis added.)

As the General Assembly has, pursuant to its authority in Section 1g, Article II, specifically placed the duty to ascertain whether initiative petitions are properly verified on the boards of elections, we cannot find that the Secretary of State has a clear legal duty to perform it himself. Mandamus will not issue to compel him to do so in the absence of a duty.

As an ancillary matter, relators argue that the protest process before the boards of elections provided in R.C. 3519.16 is too cumbersome to provide them an adequate remedy at law. The petitions were reviewed by sixty-seven different county boards. A protest before each board is manifestly inconvenient, and is not a "plain and adequate" remedy. However, that defect in the relief available before the boards will not create a duty in the Secretary of State to provide his own forum or process for relief. Furthermore, that duty cannot be created by a court through mandamus. *State, ex rel. Stanley, v. Cook, supra.*

Relators also argue that respondent Taft violated a clear legal duty when, in his Directive No. 91–40, he advised the boards of elections to ignore the circulator's compensation statement requirements of R.C. 3519.05 and 3519.06. Though he is required to advise the boards, the content of his advice is discretionary. Mandamus will not issue to govern how discretion is exercised. See *State, ex rel. Martin, v. Corrigan, supra.*

While a writ cannot issue against the Secretary of State for lack of a clear legal duty, it is apparent that the advice given in respondent Taft's Directive No. 91–40 regarding circulator compensation statements is contrary to the commands of R.C. 3519.06 concerning verification. It would be unrealistic to contend that the boards of elections could ignore the secretary's advice; there is authority that the boards were required to follow it. 1930 Ohio Atty.Gen. Ops. No. 1423. On the other hand, the circulator statement requirements of R.C. 3519.05 and 3519.06 may, as *amicus curiae* Ohio Citizen Action argues, be an unwarranted restriction or limitation on the right of initiative prohibited by Section 1g, Article II. The answer to these issues does not, however, lie in the issuance of a writ absent the necessary grounds therefor. They may be addressed in an action for declaratory judgment pursuant to R.C. Chapter 2721. Indeed, the prohibitive relief requested by relators is more suited to declaratory judgment or injunction than to mandamus, which is a command to perform an affirmative act. See *State, ex rel. Pressley, v. Indus. Comm.,* *supra,* 11 Ohio St.2d at 150, 40 O.O.2d at 147, 228 N.E.2d at 640.

Relators are not entitled to a writ of mandamus to compel the Secretary of State to reject the petitions and part-petitions herein for the failures of verification alleged, or to require him to direct the several boards of elections to do so, as he is not under a clear legal duty to perform those acts. Neither does the secretary have a clear legal duty to recall his certification from the General Assembly and resubmit the petitions to the boards. Mandamus will not lie to compel performance of duties an official does not have.

III

Sessions of the General Assembly

The petitions and part-petitions were filed with respondent Taft on December 11, 1991. Respondent Taft transmitted his certification of the text of the "toxic chemical right-to-know" law and the sufficiency of the initiative petitions by letter to the presiding officers of the General Assembly on January 6, 1992. Relators argue that respondent Taft was required by Section 1b, Article II of the Ohio Constitution to withhold his certification until January 1993, the beginning of the next "biennium" of the General Assembly.

Section 1b, Article II provides that when initiative petitions proposing a new law and containing a sufficient number of signatures are filed with the Secretary of State, he "shall transmit the same to the general assembly as soon as it convenes." An apparent exception is made for petitions filed with the secretary less than "ten days prior to the commencement of any session of the general assembly," which are, presumably, to be transmitted to the General Assembly when it convenes in the session next following.

Section 8, Article II defines the term "session" as it applies to the proceedings of the General Assembly:

"Each general assembly shall convene in first regular session on the first Monday of January in the odd-numbered year, or on the succeeding day if the first Monday of January is a legal holiday, and in second regular session on the same date of the following year.* * * "

Relators rely on *State, ex rel. Horner, v. Anderson* (1975), 41 Ohio St.2d 166, 70 O.O.2d 311, 324 N.E.2d 572, which held:

"A session of a General Assembly, within the meaning of Section 21 of Article III of the Ohio Constitution, includes both the first and second regular sessions of such General Assembly." *Id.* at paragraph one of the syllabus.

Relators argue that although Section 21, Article III concerns governor's appointments on which the General Assembly must act during the "session" in which the nomination is presented, the *Horner* definition of "session" was construed with reference to Section 8, Article II, and requires a consistent holding here. Thus, relators argue, a "session" is a biennium and respondent Taft acted contrary to law when he transmitted his certification to the General Assembly during the same biennium in which he received the petitions. They contend that he could not transmit it during the sessions of the current 119th General Assembly, but could only transmit it when the 120th General Assembly convenes in session in January 1993.

Consideration of this issue requires a distinction between the "term" of a General Assembly, which is determined by the election cycle, and the "sessions" of the General Assembly, in which each house convenes for business as provided by law. That distinction has sometimes been blurred by the peculiar history of the Ohio Constitution.

The Constitution of 1802 provided that the legislative power was vested in a General Assembly, consisting of a Senate and a House of Representatives. Section 1, Article I, Constitution of Ohio, 1802. Representatives were elected annually. *Id.* at Section 3. Senators were elected biennially. *Id.* at Section 5. Sessions of the General Assembly were annual. *Id.* at Section 25.

Dissatisfaction grew with the power granted to the General Assembly. Patterson, The Constitutions of Ohio and Allied Documents (1912) 22. The Constitution of 1851 reduced its power in various ways, but as a compromise it provided that both representatives and senators would be elected biennially. Section 2, Article II, Constitution of Ohio, 1851. Section 25, Article II was amended to provide for biennial session, as well:

"All regular sessions of the general assembly shall commence on the first Monday of January, biennially. The first session, under this constitution, shall commence on the first Monday of January, one thousand eight hundred and fifty-two."

The members of the General Assembly soon became dissatisfied with biennial sessions. Ohio Constitution Handbook (1990) xxvii. Amendments were offered in 1857 and again in 1859 to return to annual sessions. *Id.* at xxx. They were rejected by the voters. *Id.* Thereafter, the General Assembly circumvented the biennial session requirement by a parliamentary device: they "recessed" at the end of the first year instead of adjourning *sine die,* then met in the second year of the biennium in an "adjourned session." *Id.* This pattern was followed until 1973, when Section 8, Article II was adopted. *Id.* at 236.

Section 8, Article II restores a clear distinction between the *term* of a General Assembly, which coincides with the biennial election cycle, and the *sessions* of the General Assembly, which are annual and two in number during each biennial term. The "first regular session" convenes when each house is called to order by its respective presiding officer on the first Monday in January in the odd-numbered year. *Id.;* R.C. 101.01; R.C. 101.11. The "second regular session" convenes automatically on the same date of the following year. R.C. 101.01. Thus, each General Assembly meets in two regular sessions.

For purposes of Section 1b, Article II, requiring the Secretary of State to transmit his certification of a proposed law to the General Assembly "as soon as it convenes," that event occurs at the commencement of the "first regular session" or the "second regular session" following the date on which the petitions proposing the law are filed with the Secretary of State. An exception is made for an initiative proposal filed with the secretary within ten days prior to the commencement of either regular session; the secretary must withhold his certification until the regular session next following.

While *State, ex rel. Horner, v. Anderson, supra,* construes both regular sessions to constitute one "session" for purposes of Section 21, Article III, the rule of the case is distinguished by the facts involved. The General Assembly is authorized by Section 7, Article V, to determine its own rules of proceeding.

It has done so in R.C. 101.01(A), which provides: " * * * [T]he second regular session of each general assembly shall be in a continuum of the first regular session." Section 21, Article III provides that, "If an appointment is submitted during a session of the General Assembly, it shall be acted upon by the Senate during *such session* of the General Assembly * * *." (Emphasis added.) *Horner* held that R.C. 101.01 is simply a measure of the General Assembly to organize the proceedings before it, and permits the Senate to act on an appointment throughout the statutory "session" it creates for that purpose. *Horner* found no conflict with Section 8, Article II, which was intended "to provide a definite starting date for the second session of the General Assembly, while allowing the General Assembly to establish its own procedural rules for its term of office." *Id.,* 41 Ohio St.2d at 172, 70 O.O.2d at 314, 324 N.E.2d at 576.

The initiative petitions and part-petitions were filed with respondent Taft on December 11, 1991. He was required by law to transmit his certification of their sufficiency as soon as the General Assembly convened in its next regular session. That occurred on the first Monday of 1992, the date the secretary transmitted his certification letter. His actions in that respect were entirely ministerial in that they were not discretionary, but rather were performed on a given state of facts in a manner prescribed by law. *Maloney v. Rhodes* (1976), 45 Ohio St.2d 319, 323, 74 O.O.2d 499, 501, 345 N.E.2d 407, 411. His duty to comply is constitutional and, therefore, mandatory. *State, ex rel. Herbert, v. Mitchell, supra,* 136 Ohio St. at 6, 15 O.O. at 332, 22 N.E.2d at 909.

We find that respondent Taft had no clear legal duty to perform the act requested, *i.e.,* to withhold his certification of the proposed legislation until January 1993.

IV

Conclusion

Having found that respondent Taft had no clear legal duty to perform the acts which relators would compel by writ of mandamus, their petition seeking that relief must be denied. The requests for writs of mandamus to the General Assembly and respondents Butler and Johnson derive from the same alleged right and must also be denied.

*Writ denied.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS, WRIGHT and RESNICK, JJ., concur.

THOMAS J. GRADY, J., of the Second Appellate District, sitting for H. BROWN, J.