[Cite as *State ex rel. Ohio Soc. for the Prevention of Cruelty to Animals, Inc. v. Hocking Cty. Bd. of Commrs.*, 2014-Ohio-3348.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HOCKING COUNTY

| | | |
|---|---|---|
| State of Ohio, ex rel. The Ohio Society for the Prevention of Cruelty to Animals, Inc., | : : : : | |
| Plaintiff-Relator, | : : | Case No. 13CA2 |
| v. | : : : | |
| Board of County Commissioners of Hocking County, Ohio, et al., | : : : | DECISION AND JUDGMENT ENTRY |
| Defendants-Respondents. | : : : : | RELEASED 07/14/2014 |

_____

APPEARANCES:

John A. Bell, Bexley, Ohio, for Plaintiff-Relator.

Randall Lambert, Ironton, Ohio, for Defendants-Respondents.
_____

HOOVER, Administrative Judge,

The Plaintiff-Relator Ohio Society for the Prevention of Cruelty to Animals filed a petition for writ of mandamus seeking to compel the Defendants-Respondents Hocking County Commissioners and the Hocking County Dog Warden to carry out their legal duty to use humane devices and methods for the destruction of dogs and to enjoin them from euthanasia by the method of carbon monoxide inhalant in a "homemade" gas chamber. The relator claims that the current industry standards established by the American Veterinary Medical Association do not accept carbon monoxide inhalants as a humane method of euthanasia of dogs except in very limited circumstances. Relator further seeks to compel the respondents to use "Euthanasia By Injection," or "EBI" in the

operation of the Hocking County Dog Pound as the approved method for humane euthanasia.

The relator also initially sought to enjoin the use of county funds for euthanasia by carbon monoxide inhalants and compel the use of county funds for EBI pursuant to R.C. 309.12 and R.C. 309.13, and an award of expenses, costs, and attorney fees. However, we sua sponte dismissed the portion of the complaint seeking taxpayer injunctive relief, monetary damages, and attorney fees under R.C. 309.12 and R.C. 309.13 because the relator had an adequate remedy at law under the statutory provisions of R.C. 309.13. *State ex rel. The Ohio Soc. for the Prevention of Cruelty to Animals, Inc. v. Bd of Cty. Commrs. of Hocking Cty., Ohio,* 4th Dist. Hocking App. No. 13CA2, Decision and Judgment Entry, April 23, 2013. We determined that this court has no original jurisdiction to grant injunctive relief pursuant to a taxpayer's suit or to award monetary relief for damages or attorney fees pursuant to R.C. 309.13. Additionally, we ordered stricken from the complaint those allegations referencing the criminal provisions of Chapter 959 of the Ohio Revised Code because a writ of mandamus is not the proper vehicle for the enforcement of criminal laws.  *State ex rel. Ohio Soc. for the Prevention of Cruelty to Animals, Inc. v. Bd. of Commrs.,* 7th Dist. No 10-HA-2, 2011-Ohio-6029; see also Decision and Judgment Entry, April 23, 2013.

Relator filed a motion for summary judgment on its claim that the respondents have a clear legal duty under sections 955.15 and 959.06 of the Ohio Revised Code to use euthanize dogs by injection rather than by carbon monoxide gassing.  As we previously held, R.C. 959.06 is a criminal statute and any references to it have been

stricken. Therefore we will not consider relator's argument to the extent it seeks enforcement of this criminal law. Respondents oppose the motion for summary judgment on the ground that genuine issues of material fact exist as to whether euthanizing dogs using their carbon monoxide gas chamber meets the requirements under R.C. 955.15 and 955.16 as a method that immediately and painlessly renders the dog initially unconscious and subsequently dead. For the reasons set forth below, we **GRANT** relator's motion for summary judgment and issue a writ of mandamus.

### Standard of Review

A motion for summary judgment is governed by the standard set forth in Civ.R. 56. Summary judgment is appropriate when the movant has established (1) that there is no genuine issue of material fact, (2) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party, with the evidence against that party being construed most strongly in its favor, and (3) that the moving party is entitled to judgment as a matter of law. *Bostic v. Connor*, 37 Ohio St.3d 144, 146, 524 N.E.2d 881(1988); citing *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978); see also, Civ.R. 56(C).

The burden of showing that no genuine issue of material fact exists falls upon the party who moves for summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 294, 1996–Ohio–107,662 N.E.2d 264 (1996). To meet its burden, the moving party must specifically refer to "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action," that affirmatively demonstrate that the nonmoving party has no

evidence to support the nonmoving party's claims. Civ.R. 56(C); see also *Hansen v. Wal–Mart Stores, Inc.,* 4th Dist. Ross App. No. 07CA2990, 2008–Ohio–2477, at ¶ 8. After the movant supports the motion with appropriate evidentiary materials, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). "If the party does not so respond, summary judgment, if appropriate, shall be entered against the party." *Id.*

Mandamus actions are governed by Ohio Revised Code Chapter 2731. A mandamus is a writ to enforce performance of a specific act by a public official or agency and will only be issued where there is a clear legal duty to act. A writ of mandamus will not be issued when there is a plain and adequate remedy in the ordinary course of law. See R.C. 2731.05.  In order for the court to grant a writ of mandamus, the relator must show that: (1) the relator has a clear legal right to the relief prayed for; (2) respondents are under a clear legal duty to perform the acts; and (3) relator has no plain and adequate remedy in the ordinary course of law. See *State ex rel. Boardwalk Shopping Ctr., Inc. v. Ct. Apps. for Cuyahoga County*, 56 Ohio St.3d 33, 34, 564 N.E.2d 86, 87 (1990); *State ex rel. Hodges v. Taft*, 64 Ohio St.3d 1, 3, 591 N.E.2d 1186, 1188 (1992), citing *State ex rel. Harris v. Rhodes*, 54 Ohio St.2d 41, 374 N.E.2d 641 (1978); see, also, *State ex rel. Lewis v. Bd. of County Commrs. of Jackson County,* 4th Dist. Jackson App. No. 98CA830, 2002-Ohio-1424; *Conley v. Corr. Reception Ctr.*, 141 Ohio App.3d 412, 415, 2001-Ohio-2365, 751 N.E.2d 528, 530 (4th Dist. 2001).

The dispute between the relator and the respondents centers on whether or not the relator has a clear legal right to the relief prayed for: The right to compel the respondents to euthanize dogs by injection instead of using the carbon monoxide gassing method currently used by the county. Relator argues that the evidence establishes as an undisputed fact that the carbon monoxide gassing method used by respondents is not humane because it does not "immediately and painlessly render the dog initially unconscious and subsequently dead" as required by R.C. 955.16(F). Therefore they are entitled to a writ compelling the respondents to use euthanize by injection as the routine method of destruction.

Relator filed its submission of evidence, which consists of the following:

(1) The affidavit of Chris Vickers, who was employed as the assistant dog warden and humane agent for Hocking County from 1994 to 1998;

(2) The affidavit and report of Dr. David Manuta, Ph.D.;

(3) The transcript of the deposition of Donald L. Kiger, taken October 29, 2013; and

(4) The answers, admissions and interrogatory responses of the respondent.

Respondents have filed the deposition of Dr. David Manuta, Ph.D., taken October 29, 2013.

Summary of the Evidence

The Board of County Commissioners of Hocking County is required to employ a dog warden and to provide humane devices and methods for destroying dogs under R.C. 955.12 and 955.15, respectively. Further, R.C. 955.16(F) prohibits any person from destroying any dog "by the use of a high altitude decompression chamber or by

any method other than a method that immediately and painlessly renders the dog initially unconscious and subsequently dead."

The respondents euthanize dogs using carbon monoxide gassing in equipment that was not manufactured by a company that regularly manufactures euthanasia equipment, nor was it manufactured by a company that regularly manufactures air-tight enclosures for the containment of poisonous gasses. When a dog is euthanized, the respondents place it in the gas chamber, open the gas valve for one minute, shut off the valve and wait for twenty minutes. After twenty minutes the exhaust fan is activated for an additional twenty minutes.  After a total of forty-one minutes, the dog's vital functions are checked. No veterinarian is present to determine if a dog is too old or ill to be rendered immediately unconscious by the gassing procedures.  Respondents' Responses to Request for Admissions Nos. 4 – 8, 12; Kiger Deposition, p.13-15.

Donald Kiger is the dog warden for Hocking County. He was hired approximately eleven years ago and was trained by the former dog warden, Lanny Tripp, for approximately nine to ten months as an assistant dog warden before taking over the position of dog warden. Kiger Deposition, pp. 5-6, 9-10. Kiger has professional training in EBI and is certified to perform EBI. He received on-the-job training in euthanasia by carbon monoxide gassing from Tripp. Kiger Deposition, p. 7-8. Kiger testified that the carbon monoxide gas chamber used by respondents was not commercially manufactured and that the gas chamber was not air tight on the date the relator's expert, Dr. Manuta, inspected it because there was a broken floor drain and the walls and floor lacked sealant. Kiger Deposition, pp. 11-12.  There is no metering equipment

on the gassing equipment so there is no method to determine the level of concentration of carbon monoxide gas in the chamber at any given time. Kiger Deposition, pp. 20- 21. There are no scheduled inspections of the gas chamber to determine its structural integrity or proper function. Kiger Deposition, p. 26. Additionally two inspections were performed in January 2011 and January 2013. Documentation from both inspections state that the gas chamber was not being operated in compliance with federal safety regulations. Kiger Deposition, pp. 24-27.

Kiger is not a veterinarian and is unable to determine the amount of time it takes carbon monoxide to cause clinical death in a dog placed in the county's carbon monoxide chamber. Kiger Deposition, p. 17. The dog's vital functions are not monitored during the process and vital functions cannot be determined until the entire process is complete and the door to the chamber is re-opened. Kiger Deposition, p. 15. However, Kiger observes through a window in the gas chamber both large and small dogs dropping to the floor in about 60 seconds. Kiger Deposition, pp. 13, 16.  After the sixty-second period, although the dog has dropped to the floor and appears to Kiger to be unconscious, Kiger has witnessed dogs making what he characterizes as "voicing" noises or "whining." Kiger Deposition, pp.19, 38-39   Kiger testified that there are no employees, supervisors, or outside contractors working at the Hocking County Dog Pound with the training to determine if a dog has either a respiratory impairment that would make carbon monoxide gassing an ineffective method of euthanasia or is too old or too young to be effectively euthanized by carbon monoxide gassing.  Kiger Deposition, p. 22-23.

Relator submitted the affidavit of Chris Vickers, who served as the assistant dog warden and humane agent for Hocking County under the supervision of the former dog warden,Tripp, from 1994 to 1998. Vickers testified that when he first started working as the assistant dog warden, EBI was the sole method used by respondents for euthanizing dogs. Vickers stated that the approximate cost of the injectant was $75 per bottle, which could euthanize approximately 125 dogs, depending upon weight, making the costs of EBI 60 cents per dog.  However, at some point during Vickers's four-year tenure, Tripp decided to start euthanasia by carbon monoxide gassing. Vickers stated that the gas chamber was "homemade" in that it was constructed by a construction company with no experience in building air-tight enclosures.

Vickers was trained by Tripp on how to use the gas chamber. He testified that he was instructed to turn the gas on for 30 seconds, then to shut it off. Vickers testified that approximately 60 seconds into the process, he heard dogs "screaming like they had been hit by a car and injured."  Vickers Affidavit, ¶ 18. Vickers stated that he was informed by Tripp that the screaming was normal and occurred after the dogs were unconscious.  Vickers stated that when he removed the dogs from the gas chamber they would have blood, bite marks, vomit, feces and urine on their carcasses. Vickers testified that he used the carbon monoxide gassing method only a few times and then returned to the EBI method because he, "just could not stomach it." Vickers Affidavit, ¶ 22. Vickers stated that he used EBI for approximately 99 percent of the euthanasia he performed, but did continue to use the carbon monoxide chamber for particularly dangerous dogs. Vickers stated that he would help Tripp remove dogs from the gas

chamber and would routinely see bite marks, blood, feces and urine.

Vickers testified that the carbon monoxide gassing method of euthanasia often took several minutes to be effective and failed completely at times. During the time that the gassing is administered, dogs struggle, fight, and urinate and defecate on themselves.

Kiger's and Vickers's employment with the Hocking County dog warden did not overlap. Kiger testified that he did not know what the training practices and policies were prior to his employment. Kiger Deposition, p. 27-28. However, Kiger did confirm that multiple dogs were placed in the carbon monoxide gas chamber simultaneously when he was first employed, but the policy was changed after they learned that multiple dogs in the gas chamber could fight and injure each other during the gassing procedure. Kiger Deposition, p. 17-18.  While both Kiger and Vickers testified that they received on-the-job training by Tripp on use of the carbon monoxide chamber, respondents did not provide evidence of Tripp's training, if any. Respondents also did not submit any written procedures for the operation or maintenance of the chamber. We note that the time period for administering carbon monoxide gas differed. Vickers was instructed to release it for 30 seconds; Kiger, 60 seconds.

In Kiger's opinion, euthanasia by carbon monoxide gassing is a humane way to destroy dogs. Kiger Deposition, pp. 44-45. In Vicker's opinion, euthanasia by carbon monoxide gassing is a cruel, inhumane, and painful way to destroy dogs. Vickers Affidavit, ¶28.

Relator proffers Dr. Manuta as an expert witness via an affidavit.  Under Ohio

Evid.R. 702, a witness may testify as an expert if all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

> (2) The design of the procedure, test, or experiment reliably implements the theory;

> (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

Rule 56(E) requires an expert witness's affidavit to "show affirmatively that the affiant is competent to testify to the matters stated in the affidavit."

Dr. Manuta attached a curriculum vitae to his affidavit which sufficiently establishes him as a chemistry expert as required by Evid. R. 702(B). Dr. Manuta also testified concerning the respondents' operation of a carbon monoxide gas chamber and he compares it with the euthanasia guidelines of the American Humane Society and the American Veterinary Medical Association Guidelines on Euthanasia, 2013 Edition. This testimony relates to matters beyond the knowledge or experience possessed by lay persons under Evid. R. 702(A). Dr. Manuta also performed a visual inspection of the carbon monoxide gas chamber used by respondents to euthanize dogs and witnessed

the gassing procedure as performed by Kiger.  His inspection conforms to Evid. R. 702(C)(1)-(3).

Evid. R. 703 provides that, "the facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing."  The rule requirement of "perceived by the expert" refers to personal knowledge. *State v. Solomon*, 59 Ohio St.3d 124, 570 N.E.2d 1118 (1991)("Where an expert bases his opinion, in whole or major part, on facts or data perceived by him, the requirement of Evid.R. 703 has been satisfied."); *Worthington City Schools v. ABCO Insulation*, 84 Ohio App.3d 144 (10th Dist. 1992).

Respondents make no objection to Dr. Manuta's qualifications or to the use of him as an expert witness.  Additionally, they submitted the deposition testimony of Dr. Manuta to support their opposition to relator's summary judgment motion.  Based on the affidavit of Dr. Manuta and the testimony he provided in his deposition concerning his qualifications and education, we find that Dr. Manuta is qualified as an expert witness on the matter of whether the carbon monoxide gas chamber used by respondents comports with industry standards set forth in the American Veterinary Medical Association Guidelines for the Euthanasia of Animals, 2013 Edition.

Both sides rely upon AVMA Guidelines to support their position that carbon monoxide gassing is or is not a humane method of euthanasia for dogs.  Dr. Manuta cites it in his report as a document that he used in reaching his conclusions. Respondents attached an excerpt of it to their memorandum in opposition to summary judgment to use it for impeachment purposes.  Relator then cited to other provisions of

the AVMA Guidelines in its reply memorandum to rehabilitate Dr. Manuta's testimony.

Respondents also admitted that the AVMA Guidelines publication is a "learned treatise"

under Evid. R. 803(18) and is a "reliable authority."  See Defendant-Respondent's

Response to Plaintiff-Relator's First Set of Requests for Admissions, Nos. 1 & 2.

Ohio Rules of Evidence 803(18) states that statements contained in learned

treatises are not excluded by the hearsay rule:

> (18) Learned Treatises. To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

Because Dr. Manuta relied upon them in his report and deposition testimony and both

sides stipulated to the status of the AVMA Guidelines as a learned treatise, we will

consider as evidence the statements contained therein as provided in Dr. Manuta's

report, as provided in the deposition of Dr. Manuta for impeachment purposes, and as

further provided by relator to rehabilitate Dr. Manuta's testimony. *Moretz v. Muakkassa*,

137 Ohio St.3d 171, 998 N.E.2d 479 (2013); *Miller v. Defiance Regional Med. Ctr.*, 6th

Dist. Lucas App. No. L-06-1111, 2007-Ohio-7101(holding that additional statements

from the learned treatise could be used to rehabilitate expert witness); *Hinkle v.*

*Cleveland Clinic Foundation*, 159 Ohio App.3d 351, 2004-Ohio-6853 (8th

Dist.)(statements from learned treatise could be used to rehabilitate expert witness).

Evid.R. 803(18) contains "safeguards against unreliability and misuse" by

forbidding the use of a learned treatise substantively as an exhibit:

> Misunderstanding is guarded against by the fact that the statements in learned treatises come to the trier of fact only through the testimony of qualified experts who are on the stand to explain and apply the material in the treatise. The rule provides that the treatise may be read into evidence but not received as an exhibit to prevent the trier from giving it excessive weight or attempting to interpret the treatise by itself.

2006 Staff Notes to Evid.R. 803(18); *Moretz,* 137 Ohio St.3d at 185.

Thus, we accept the various statements from the AVMA Guidelines as evidence, but, absent an agreement or written stipulation between the parties, we will not admit it as an exhibit. We clarify this point because, in the dialogue between the parties' counsel which occurred on the record at the deposition of Dr. Manuta, the parties stated their intention to submit the AVMA Guidelines, 2013 Edition, as a stipulated exhibit to this court as part of the record. It was marked as Exhibit 5 to Dr. Manuta's deposition. Manuta Deposition, pp. 30-31. However, when respondents filed Dr. Manuta's deposition transcript, none of the exhibits used in the deposition were submitted. Thus, the record does not contain the AVMA Guidelines for the Euthanasia of Animals, 2013 Edition. Only those statements from the AVMA Guidelines that were relied upon by Dr. Manuta in his report, read into the record for impeachment purposes at Dr. Manuta's deposition, or quoted by relator to rehabilitate Dr. Manuta in its reply memorandum are part of the record for our consideration.

Dr. Manuta's report states that the AVMA deems carbon monoxide gassing for euthanizing animals acceptable when it is done in a properly manufactured, equipped, and maintained chamber, operated by trained personnel. Manuta Report, p. 1. Carbon monoxide induces loss of consciousness without pain and with minimal discernable discomfort, depending upon species. Manuta Deposition, p. 33. However, the AVMA

Guidelines conclude that, although carbon monoxide is acceptable with conditions for use in institutional situations where appropriately designed and maintained equipment and trained and monitored personnel are available to administer it, it is not recommended for routine euthanasia of cats and dogs. AVMA Guidelines on Euthanasia, p. 45, Relator's Reply, p. 10. Euthanasia by injection is the preferred method of euthanasia for dogs according to the AVMA Guidelines.  Manuta Deposition, p. 56. Dr. Manuta also stated that authorities on which he relied found that carbon monoxide gassing caused loss of consciousness and death in animals in a range of several minutes to 25 to 30 minutes. By comparison, unconsciousness by EBI, occurs within 3 to 5 seconds, with death occurring within 2 to 5 minutes.  Manuta Report, p. 4.

Dr. Manuta inspected the carbon monoxide chamber used by the respondents on July 16, 2013, and found that it was not properly manufactured, equipped, or maintained. Manuta Report, p.1 According to his report and the photographic exhibits, the carbon monoxide chamber was not properly manufactured, it was not manufactured by a company that regularly manufactures euthanasia equipment, nor was it manufactured by a company that regularly manufactures air-tight enclosures for the containment of poisonous gasses.  The chamber had numerous compromises and cracks.

During the visual inspection, Kiger operated the carbon monoxide chamber in an empty state for Dr. Manuta's observation.  Dr. Manuta noted that Kiger released carbon monoxide on a timed basis, rather than a percentage concentration or rate-of-flow basis. Therefore percentage levels of carbon monoxide achieved in the chamber are not

measured or known by respondents. Manuta Report, p. 7; Manuta Deposition, pp. 27, 44-48.

Dr. Manuta testified that the AVMA Guidelines list eight conditions that must be met before carbon monoxide gas chamber can be used as an acceptable method of euthanizing animals. The carbon monoxide chamber used by respondents fails a number of these conditions. First, personnel must be instructed thoroughly concerning the hazards and limitations of carbon monoxide.  Dr. Manuta stated that respondents fail to meet this condition because the workstation does not contain the material safety data sheets for the carbon monoxide tanks and personnel must be able to have access to these sheets and be trained on the hazards. Manuta Deposition, 35-36. Additionally, the personnel do not use hand-held carbon monoxide monitors to take readings of carbon monoxide levels in and around the chamber to ensure the chamber is operating safely within established standards. Manuta Deposition, pp. 41-42.

The AVMA Guidelines also require the gas chamber to be of the highest quality construction.  Here, the chamber was not commercially manufactured and there is no documentation concerning its construction. As a result, the chamber lacks any certification that it conforms to the relevant industry standards. Manuta Deposition, pp. 37-38.  Sections of grouting were pulling away, the drain plate was broken, the scrubber, which operates to exhaust or remove carbon monoxide safely, was not adequately maintained, and the personnel had inadequate knowledge and training concerning the scrubber.  Manuta Report, p. 7; Manuta Deposition, pp. 39-40.  The personnel did not have copies of or knowledge of the certificate of analysis for the

carbon monoxide tanks. As a result, the measure of impurities or adulterants in the carbon monoxide used in the process is unknown.  Manuta Deposition, pp. 45-46.

Finally, Dr. Manuta stated that the AVMA Guidelines require that the carbon monoxide flow should be adequate to rapidly achieve a uniform carbon monoxide concentration of at least 6 percent. Manuta Deposition, p. 44. Carbon monoxide induces loss of consciousness without pain and with minimal discernible discomfort, death occurs rapidly if concentrations of 4 to 6 percent are used. Manuta Deposition, p. 65. Dr. Manuta testified that the method used by respondents for dosing out carbon monoxide does not allow respondents' personnel to know when or if a 6 percent level is ever achieved. Manuta Deposition, pp. 44-45.  Dr. Manuta testified that the ability to ascertain the level of carbon monoxide in the tank is crucial to the humane application of it as noted in the AVMA Guidelines. The lower the rate of carbon monoxide entering the dog's system, the longer and slower the suffocation process. Manuta Deposition, pp. 46-48.

Although Dr. Manuta's report contains the statement that the AVMA Guidelines finds carbon monoxide gassing inhumane for euthanizing cats and dogs, he acknowledged that, in fact, the AVMA finds it to be acceptable if all of the conditions outlined in the Guidelines can be met. Manuta Report, p. 1; Manuta Deposition, pp. 19, 25, 28, 29-30, 59.  Dr. Manuta presented evidence and testimony based on his inspection of the respondents' carbon monoxide chamber that the chamber does not comply with a number of the AVMA conditions and therefore is not an acceptable method of euthanizing dogs. Manuta Deposition, pp. 70-71. Dr. Manuta's report draws

various conclusions concerning the respondents' carbon monoxide chamber and finds, to a reasonable degree of scientific certainty, that the carbon monoxide gassing method used by the respondents' is not immediate and painless. Manuta Report, p. 8.

Legal Analysis

The question before us is whether or not the respondents' method of carbon monoxide gassing for euthanasia of dogs is one that "immediately and painlessly renders the dog initially unconscious and subsequently dead" as required by R.C. 955.16(F).

The relator presented undisputed evidence that the repondents' carbon monoxide chamber is unacceptable under the industry standards as set forth in the AVMA Guidelines for the Euthanasia of Animals, 2013 Edition. Several of these conditions are critical to the method's ability to "immediately and painlessly rendering the dog initially unconscious and subsequently dead." First, it is undisputed that the chamber is not commercially manufactured, but instead was constructed by a company with no prior experience in constructing air-tight gas chambers. It is not "of the highest quality construction" – one of the factors Dr. Manuta testified must be present for the method to meet the AVMA conditions.  Kiger testified it was not air-tight at the time Dr. Manuta inspected it. And, although Kiger testified that he has applied a sealant to the walls and had redone some of the seals around the door since Dr. Manuta's inspection, he did not testify that this caused the chamber to be air-tight. Kiger Deposition, p. 38. Respondents placed no evidence on the record showing that the chamber is now air-tight. Thus, even construing Kiger's testimony most favorable for the respondents, we

cannot draw the inference that these efforts created an air-tight chamber when the respondent has not place any evidence on the record that the chamber was subsequently made air-tight.

Not only do respondents lack a commercial-grade air-tight carbon monoxide chamber, but their personnel lack a metering system to monitor the concentration of carbon monoxide in the chamber to determine if it rapidly achieves a uniform carbon monoxide concentration of at least 6 percent after the dog is placed in the chamber. Kiger Deposition, pp. 20-21. Dr. Manuta testified that it this gas displacement rate that is crucial to the humane application of carbon monoxide. Manuta Deposition, p. 47.

Without an air-tight chamber and an administration of carbon monoxide that rapidly achieves a uniform concentration of at least 6 percent, there is no evidence, either anecdotal or scientific, on which we can conclude that respondents' method of carbon monoxide gassing for euthanasia of dogs is one that "immediately and painlessly renders the dog initially unconscious and subsequently dead" as required by R.C. 955.16(F). Although neither side produced expert veterinarian testimony concerning the speed with which the respondents' gassing method rendered dogs unconscious, both Kiger and Vickers testified that when multiple dogs were placed in the chamber, they had sufficient time and consciousness to engage in fighting. The fighting episodes were prolonged and aggressive enough to result in bite wounds and bleeding.

Respondents argue that there is a genuine issue of material fact because Kiger believes that the dogs lose consciousness after approximately 60 seconds because he

sees them falling to the floor and that he believes this occurs painlessly and immediately. Respondents' opposition memorandum, pp. 3, 6. However, Kiger testified that he does not physically monitor the dogs' vital signs during the gassing process and that he is not a veterinary and, therefore, cannot determine what the dogs are actually physically experiencing. We agree that there are differing opinions in this case between Kiger, Vickers, and Dr. Manuta as to whether carbon monoxide gassing is a humane method to destroy dogs. But this is ultimately a question for this court to decide based upon the evidence before us. Differing opinions do not constitute disputed facts that would prevent us from rendering summary judgment in this case.

Respondents also urge the court to take into account the disadvantages of euthanasia by injection when deciding whether to grant relator's summary judgment. Respondents argue that restraints must be used to euthanize a dog by EBI and this is stressful for both dog and personnel.  However, with respect to the stress experienced by the personnel, we find that the relevant statutory provisions governing euthanasia address the stress to the dog, not to the personnel administering the process. Even if we were to take into consideration stress to personnel, the evidence respondents' offer is inadmissible hearsay evidence. Kiger's testimony about what he was told by Tripp about Tripp's stress in administering EBI is hearsay. The affidavit testimony of Vickers is admissible and states that he found the stress of the carbon monoxide gassing process more stressful than EBI. Vickers Affidavit, ¶ 22. Finally, if we took into account the disadvantages of EBI from the personnel's perspective, we would also need to look at the disadvantages, including safety concerns, of the respondents' current carbon

monoxide chamber. Dr. Manuta testified that, because of the number of problems with the chamber, its operation is dangerous to personnel. Manuta Report, p. 8.

In making a determination about whether EBI is a humane method of euthanasia, R.C. 955.16(F) requires us to determine only if EBI "immediately and painlessly renders the dog initially unconscious and subsequently dead." The relator has presented undisputed evidence that EBI is the recommended method of euthanasia for dogs and that it renders a dog unconscious in matter of 3 to 5 seconds. Kiger testified that he has witnessed EBI taking 60 seconds on two occasions because a thick injectant was used. However, even if we construe this evidence in respondents favor, it would mean EBI may occasionally take 60 seconds. The typical, expected time would be 3 to 5 seconds. Therefore, we find that EBI immediately and painlessly renders the dog initially unconscious and subsequently dead and is a humane method of euthanasia.

Finally, respondents argue that we should follow the Seventh District Court of Appeals decision in *State ex rel. Phelps v. Columbiana Cty. Commrs.,* 125 Ohio App.2d 414, 708 N.E.2d 784 (7th Dist. 1998). In *Phelps*, the court of appeals affirmed a trial court's decision made after a presentation of evidence at a trial. The suit was brought by a taxpayer "to halt the use of the county's antiquated carbon monoxide mechanism as a means of euthanizing dogs." *Id.* at 417. However, after the lawsuit was filed, the county went out a purchased a newly manufactured carbon monoxide chamber to replace the old one. After the discovery phase, a trial was held and the evidence submitted to the trial court centered on euthanasia as administered with the newly manufactured carbon monoxide chamber. *Phelps* is distinguishable from this case on that basis alone. Here,

respondents are using a "homemade" or non-commercially manufactured carbon monoxide chamber that fails to comply with AVMA industry standards in a number of materially significant ways, making it an unacceptable method of euthanasia.

We find that the relator has established that there is no genuine issue of material fact concerning the respondents' carbon monoxide chamber's failure as a method that immediately and painlessly renders the dog initially unconscious and subsequently dead. Construing the evidence most strongly in respondents' favor, we **GRANT** relator's motion for summary judgment and find that relator is entitled to a writ of mandamus as a matter of law.

## Conclusion

We find that the respondents' carbon monoxide method of euthanasia as the standard method of destruction of dogs does not immediately and painlessly render the dog initially unconscious and subsequently dead and is not humane. Therefore, we **GRANT** relator's motion for summary judgment and issue a writ of mandamus compelling the respondent Dog Warden of Hocking County to euthanize dogs by injection as the routine means of destruction in accordance with R.C. 955.16(F). We further issue a writ of mandamus compelling the respondent Board of County Commissioners of Hocking County to provide euthanasia by injection as the humane device and method for destroying dogs in accordance with their obligations under R.C. 955.15.

The clerk shall serve a copy of this order on all counsel of record and any unrepresented parties at their last known addresses by ordinary mail.

**MOTION GRANTED.  WRIT ISSUED. IT IS SO ORDERED. COSTS TO RESPONDENTS.**

Abele, P.J. and McFarland, J.: Concur in judgment only

**FOR THE COURT**

_____
Marie Hoover
Administrative Judge

**NOTICE**

      **This document constitutes a final judgment entry and the time period for appeal commences from the date of filing with the clerk.**

      **Pursuant to Civ.R. 58(B), the clerk is ORDERED to serve notice of the judgment and its date of entry upon the journal on all parties who are not in default for failure to appear.  Within three (3) days after journalization of this entry, the clerk is required to serve notice of the judgment pursuant to Civ.R. 5(B), and shall note the service in the appearance docket.**